Filed 6/9/15  P. v Davis CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060920 |
| v. | (Super.Ct.No. FVI1200972) |
| EUGENE HOUSTON DAVIS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Debra Harris, Judge.  Affirmed with directions.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant, Eugene Davis, of two counts of willful, premeditated and deliberate attempted murder (Pen. Code, §§ 664/187, subd. (a)),[1] during which he inflicted great bodily injury (§ 12022.7, subd. (a)) and during one of which he used a firearm (§ 12022.5, subds. (a) &(d)) and discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) and during the other, used a knife (§ 12022.7, subd. (a)); assault with a firearm (§ 245, subd. (a)(2)), during which he used a firearm and inflicted great bodily injury; assault with a deadly weapon (§ 245, subd. (a)(1)), during which he inflicted great bodily injury, and possessing a firearm by someone who had been convicted of a violent offense (§ 29905). In bifurcated proceedings, defendant admitted having suffered a strike prior (§ 667, subds. (b)-(i)), a serious prior (§ 667, subd. (a)(1)) and two priors for which he served prison terms (§ 667.5, subd. (b)). The trial court sentenced defendant to prison[2] and he appeals, claiming insufficient evidence supports his conviction of the attempted murder of one victim and the jury was misinstructed as to the attempted murder of the other. We reject his contentions and affirm, while directing the trial court to clear up ambiguities in its sentence and to correct court minutes and the abstract of judgment.

## FACTS

The female victim testified that she had known defendant, who, like her, was "homeless," for a few years and she was unaware of any problems he might have had

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] See the disposition for a description of the sentence imposed.

with her.  Defendant lived at a trailer park/campground near the bed of the Mojave River.

At 6:45 a.m. on April 19, 2012, the female victim awoke to the barking of a dog she and

her boyfriend, the male victim, kept outside their tent in the riverbed.  She got up, went

outside and looked around, but saw nothing and started to go back into the tent when she

heard a whistle.  She looked in the direction from which the whistle came and saw

defendant standing 15 feet away, with a shotgun wrapped in a blanket slung over his

shoulder.  The female victim addressed defendant by his first name and asked him what

he was doing in her camp with a gun.  Defendant called the female victim "Jamie"—the

name of defendant's girlfriend at the time—who looked nothing like the female victim.

Jamie prostituted herself, sometimes for drugs.  The female victim told defendant that she

was not Jamie, asked him why he was calling her "Jamie" and told him that she and he

had had no problems and he needed to leave her camp with the gun.  Defendant told the

female victim to get the male victim, who was in the tent.  Defendant seemed angry.  The

female victim went back into her tent and told the male victim to go outside because

defendant had a gun.  She laid down on her bed, but in a position opposite how she

usually slept, in order to hear what was about to transpire between defendant and the

male victim.  By this time, defendant was "right at" the tent.  He suggested to the male

victim that they go for a walk and have a cigarette.  The male victim declined, saying he

was not going anywhere with defendant with a gun.  He asked defendant what was

wrong.  Defendant repeated his suggestion that they go for a walk and a cigarette.  The

male victim repeated his response.  Defendant sounded increasingly angry, but the male

3

victim was not. The male victim suggested they "sit down right here," meaning on chairs near the barbeque pit and have a cigarette. The shotgun went off, hitting the female victim's back. She was airlifted to the hospital, where she remained for four days.

The male victim testified that he had known defendant for two years, the two had gotten along and there was no on-going argument between them. When the former went outside his tent, after being told by the female victim that defendant was there with a gun, the shotgun was not wrapped in the blanket and defendant was standing at the edge of the platform on which the 14 foot by 16 foot tent rested, ten feet from the front of the tent. Defendant held the shotgun in his right hand, with his finger on the trigger, and the stock under his right arm. The shotgun was pointed at the tent, but the male victim was not in the line of fire. Defendant asked the male victim if Jamie, whom the male victim had not seen in over a year, was there. The male victim told defendant he did not know where Jamie was. Although defendant did not appear to be angry at the male victim at that moment, he appeared to be a little angry when he then asked the male victim to go for a walk with him. Defendant seemed to get more angry and was agitated and upset when the male victim did not agree to the walk and defendant asked him, perhaps, another two times, with the male victim declining each time. The male victim approached defendant to ask why defendant was there and defendant appeared to be "spaced out." The male victim was to the left of defendant and not in the line of fire. Defendant held the shotgun with both hands, keeping his right hand on the trigger. The male victim opined that a shotgun had to be held in both hands in order to be fired—if held in just one hand, firing

4

it would knock the shooter "on [his] butt." For two or three minutes, defendant and the male victim conversed, with the male victim saying that Jamie was not there and asking defendant to leave. The shotgun, which had to have been pumped to fire, went off, hitting the female victim's left shoulder. The male victim opined that defendant had not fired the gun accidentally. The female victim called out that she had been hit and the male victim went into the tent to check on her. She was hysterical. The male victim went back outside, stood next to defendant and asked him two or three times why he had shot the female victim. Defendant said nothing and he did not seemed shocked or surprised. The male victim reached for the barrel of the shotgun, grabbed it and pulled it down so defendant could not fire it again and he and defendant began struggling over it. Defendant turned around and stabbed the male victim in the right side of his neck, inflicting two stab wounds, while asking the male victim if it hurt. The male victim was unarmed and was doing nothing to defendant to inflict serious pain. The male victim responded that it did not hurt and he grabbed the knife out of his neck, where it had become lodged, and stabbed defendant. He asked defendant if it hurt. Defendant and the male victim wrestled with each other. The male victim asked defendant if defendant had had enough. Both released the gun and defendant took off. One of the stab wounds was one-sixteenth of an inch from the male victim's spinal cord. The male victim received five stitches and was released from the hospital that night.

Defendant admitted at trial unintentionally dropping the shotgun as he made his way back to his camp, but he denied trying to hide it, although he conceded that the

police were unable to find it. He testified that the night before the crimes, his girlfriend, Jamie, had been out all night, after leaving at 7:00 p.m. and telling defendant that she was going shopping, and when she returned at 6:30 a.m. the next day, she told him something so upsetting that he was convinced that he needed to contact all the people that she had been with the night before and check out her story,[3] and, if it was true, he would have to do and/or say something, but if it was a lie, he would have to terminate his relationship with her. Defendant said that he and Jamie left their place of residence about the same time that morning, but, curiously, he also testified that when he eventually returned, she was still there, never having left. Defendant's first stop was the tent of the female and male victims, because Jamie had told him that she had gone to the river bed camp first the night before. In fact, defendant first went to the tent of the victims' neighbor, asked him where the male victim was and the neighbor roused the female victim for defendant. Defendant testified that near the tent, he found the shotgun covered with a blanket and he inspected it, finding it was loaded. He claimed that although he was a parolee and knew possessing a shotgun would land him back in prison, he picked it up because he feared people who brought their children to play in the riverbed would find it.[4] He also claimed that he did not remove the shotgun shells from the shotgun because he had other metal objects in his pockets that he feared would "set off" the bullets if placed in close

___

[3] Apparently, it was a harrowing story, as defendant testified that Jamie was "frightened in the face" as she was telling it to him.

[4] His testimony was contradicted by the testimony of a sheriff's department detective who, during a dozen trips to the riverbed, never saw a child there.

6

proximity to them.[5] He asserted that he wrapped the shotgun in his hoodie to prevent people who didn't like him from reporting that he had possession of it. He testified that even though the female victim had known him for six or seven years, when she came outside her tent and saw him, she asked him who he was. Defendant asked for the male victim, with whom he wanted to discuss Jamie. The female victim went back inside the tent and the male victim, whom defendant had known also for six or seven years, came outside. Defendant told the male victim that he wanted to discuss Jamie "and what happened last night" and he asked the male victim if the latter wanted to sit down and have a cigarette. The male victim told defendant he had nothing to say to him. Defendant claimed that he struggled to keep control of the shotgun, the male victim asked him what the shotgun "was doing," defendant said he did not know and the male victim asked to see the shotgun. Defendant pulled it over the front of his head, unwrapped it and as it came down, it accidentally went off. Although he heard the female victim react to being shot by him and he saw blood on her, he said nothing because he was stunned. The male victim told defendant that he needed to leave. Defendant backed up and the male victim charged at him, grabbed the shotgun with both hands and tried to turn it, while defendant held onto the butt. The knife defendant kept under his watchband began to fall out while the male victim was struggling with defendant and defendant stabbed the male victim "out of instinct" and because he was afraid the male victim would turn the shotgun

---

[5] This testimony was contradicted by the testimony of the detective, who said that no items were recovered from defendant's person upon his arrest.

7

around and shoot defendant. Defendant claimed he intended to stab the male victim in the deltoid muscle[6] to stop the latter from pulling on the shotgun, but he got as close to that muscle as he could. He testified that he asked the male victim if it hurt because he knew if it hurt, the latter would stop and he wanted to know when the latter was going to stop trying to turn the shotgun on him. Defendant lost his grip on the knife due to the struggle and it fell. The male victim then stabbed defendant in the ribs two times with it.

## ISSUES AND DISCUSSION

1. *Insufficient Evidence of Intent to Kill the Female Victim*

Defendant claims there was insufficient evidence that he intended to kill the female victim. We disagree. Much of what defendant did made no sense, so there is no point trying to take a logical view of his actions. This means that the fact that he did not make a second attempt to kill her as she went to the next camp to seek aid after being shot does not make the jury's conclusion unsupportable. First, there was no testimony about the coincidence of events, i.e., whether the female victim left her tent and went to the next camp while defendant was busy talking with, stabbing or being stabbed by the male victim. If that was the case, it would explain defendant's failure to make a second attempt at killing the female victim that has nothing to do with his intention towards her. Even if defendant was not otherwise engaged, the fact that he did not make a second attempt on her life is of no moment to the jury's finding that he intended to kill her when

_____

[6] It is at the shoulder.

8

he fired the shotgun. He could have changed his mind or he could have been distracted by his interaction with the male victim.

Additionally, the fact that he seemed to have been angry with the male victim, and not with the female victim, does not require a finding of insufficient evidence. The female victim testified that defendant appeared to be angry when he was talking to her, even before the male victim came out of the tent. The male victim testified that defendant became increasingly angry when he refused to take a walk with him, just before defendant fired the shotgun. Although one could assume that a rational person would not normally direct his anger at the wrong person, i.e. the female victim, defendant was not behaving rationally that day, and, according to the male victim was "spaced out." The fact remains that defendant, a self-proclaimed armed forces expert in firearms held what he knew to be a loaded shotgun in both hands, at some point pumped it, aimed at and fired it into a 14 foot by 16 foot canvas tent, knowing that the female victim was inside. Even though defendant was originally seeking out the male victim, and, at the time he fired, the male victim was closer to him than the female victim, he did not fire the shotgun at the former, but, rather, at the direction of the latter. From this, the jury could reasonably infer that, whatever the angry defendant's illogical reason for wanting to kill the female victim, he, in fact, intended to do just that.

2. *Failure to Instruct on the Lesser Included Offense of Attempted Voluntary Manslaughter Based on Unreasonable Self-Defense*

Based on defendant's testimony that he stabbed the male victim twice because he was afraid the male victim would shoot him with the shotgun, the jury was instructed as to perfect self-defense for the attempted murder of the male victim and the assault on him with the knife. Defendant here contends that the trial court had a sua sponte duty to instruct on attempted voluntary manslaughter on the theory that he stabbed the male victim in the unreasonable belief that he needed to defend himself. Specifically, the instructions on imperfect self-defense provide, "The difference between complete . . . self-defense . . . and imperfect . . . self-defense . . . depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect . . . self-defense . . . if: [¶] . . . [t]he defendant believed that . . . he . . . was in imminent danger of being killed or suffering great bodily injury[] [¶] and [¶] . . . [t]he defendant believed that the immediate use of deadly force was necessary to defend against the danger[] [¶] but [¶] . . . [a]t least one of the defendant's beliefs was unreasonable." (Judicial Council of California Criminal Jury Instructions, CALCRIM No. 604.)

Defendant's argument that there was substantial evidence (*People v. Breverman* (1998) 19 Cal.4th 142, 162) to support the giving of an unreasonable self-defense instruction is lacking. Defendant correctly points out that "there was clear evidence that [he] actually believed that he was in imminent danger of suffering great bodily injury and

10

that he had to use deadly force to defend himself against that danger." However, defendant points to no evidence whatsoever that either of these beliefs was unreasonable under the circumstances. Defendant offered no evidence that either of these asserted beliefs was unreasonable and no inference could be made from any of the evidence offered at trial that they were. Therefore, there was no substantial evidence to support the giving of this instruction.

"Where . . . the defendant's version of events, if believed, establish [perfect] self-defense, while the prosecutor's version, if believed, negates both [perfect] and imperfect self-defense, the court is not required to give the [imperfect self-defense] instruction." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834.) In *People v. Duff* (2014) 58 Cal.4th 527, the defendant confessed to shooting two victims and explained that he and one of them were in the process of trading guns for drugs when both victims pulled guns on him and demanded his guns and money. (*Id*. at p. 535.) The defendant told the victims that he did not want trouble and was leaving when someone fired a shot and the defendant returned fire, eventually killing both victims. (*Ibid*.) Rejecting the defendant's claim that the trial court erred in refusing to instruct on imperfect self-defense, the California Supreme Court held, "[T]he jury could have credited [the] version of events [defendant gave during his confession] . . . . But the problem, at least for finding an obligation to instruct on voluntary manslaughter, is that if believed, [the defendant's] version could lead only to a finding of justifiable homicide and a total acquittal on the homicide charges. The use of lethal force in response to being shot at . . . is perfect self-

11

defense and no crime. [Citations.] While [the defendant] argues the jury could have concluded he unreasonably misperceived the situation, the circumstances described by [the defendant] leave no room for such shades of gray. Either he was attacked, in which case he committed no crime, or he was not, in which case he committed murder." (*Id.* at p. 562.) Defendant here does not even attempt to make the argument that he unreasonably misperceived the need to defend himself. Even if he had, he would still not have been entitled to the instruction, as the circumstances defendant described leave no room for a finding that his belief that the male victim would turn the gun on him and shoot him was unreasonable under the circumstances.[7]

Similarly, in *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1227-1230, 1232, the appellate court rejected the defendant's contention that the trial court had a sua sponte duty to instruct on imperfect self-defense thusly, "It cannot be said . . . that if the jury credited [the defendant's] testimony, his actual belief that he was in imminent danger might also be deemed unreasonable. [The defendant testified that] the [car containing the

---

[7] The People offer a different reason why defendant was not entitled to an imperfect self-defense instruction, i.e., the fact that he was the initial aggressor and the male victim trying to stop him from using the gun again was legally justified. (*People v. Seaton* (2001) 26 Cal.4th 598, 664 (*Seaton*); *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) In *Seaton*, the defendant, who was angry at the victim, went to the latter's house, and hit him with his fist. (*Seaton*, at p. 629.) The victim got a hammer, which the defendant grabbed and used to kill the victim. (*Ibid.*) In rejecting the defendant's claim that the jury should have been instructed, sua sponte, on voluntary manslaughter on the theory of unreasonable self defense, the Supreme Court held, "[the] defendant's testimony showed him to be the initial aggressor and the victim's response [was] legally justified . . . ." (*Id.* at p. 664.) The only problem with this is that if defendant's testimony was believed by the jury, he was not the initial aggressor, as he claimed he shot the female victim accidentally.

12

victims] was following him, the occupants shouted an insult to his gang and the name of a rival gang, [he] heard a popping sound which he believed was shooting, and when the [car containing the victims] tried to block [his] car from moving, a passenger in [that car] with a black object in his hand started to open the door. A reasonable jury could not conclude that [the defendant]'s actual fear of imminent death or great bodily injury was unreasonable. [¶] [He] argues that his testimony provided a factual basis on which a jury could conclude that his actual fear . . . was unreasonable . . . [in that] he did not testify that he actually saw a gun pointed at him, and that his car was not entirely blocked off by [the victims' car]. [His] belief that he was being pursued by rival gang members with a gun, however, need not have been definitely proven true . . . . His belief must only have been reasonable, and there was no evidence that it was otherwise. . . . [N]o principle of law required the trial judge . . . to disregard the evidence in order to find that the jury should consider a theory not supported by the evidence. [Citation.] This is especially true when, as in this case, the evidence actually introduced on the point—the defendant's own testimony—was to the contrary. [¶] [The defendant's] testimony, if the jury believed him, could only lead to a conclusion that he acted in justifiable self-defense . . . , not to a conclusion that he acted in imperfect self-defense. If the jury believed the prosecution's theory . . . it is inconceivable that they would conclude that [the defendant] actually believed he needed to defend himself . . . ."

Defendant further asserts that in convicting him of attempted murder, and thereby rejecting his defense of perfect self-defense, the jury "possibly determine[d] that it was

13

unreasonable for [him] to believe that [the male victim] was going to take the gun away from him and shoot him with it." First, what the jury possibly determined is not the same as the presence of substantial evidence, requiring the giving of an instruction. Second, it is an even greater possibility that the jury simply did not believe defendant's claim that he feared the male victim was going to take the gun and shoot him with it, but, instead, believed the male victim's testimony that he grabbed the gun and pulled it down for the sole purpose of preventing defendant from firing it again and defendant tried to stop him from doing this, so they struggled over the weapon.

### DISPOSITION

The trial court is directed to make the following corrections: In the minutes for October 31, 2012, reference to "special circumstances" attached to count one is to be deleted. In its place, it shall be noted that the jury found true the allegation that the attempted murder was willful, deliberate and premeditated. The same notation shall be made for the count two attempted murder. The reference to the trial court striking the section 12022.53, subdivision (b) allegation as to count one and the 2001 prison prior true finding shall be deleted, as the trial court made no such order on October 31, 2013. In fact, the jury failed to return a true finding as to the section 12022.53, subdivision (c) allegation and defendant admitted having suffered the 2001 prison prior conviction. The reference to the priors being admitted by defendant should be changed from defendant admitting priors number one and number three to defendant admitting priors number one, two, three, and four.

14

As to the enhancement for defendant's prior serious felony conviction, the sentencing court said, "Five years for the [section] 667[, subdivision] (a)(1) prior, which is stayed pursuant to [section] 654." However, in supplemental briefing, the parties agree that the sentencing court had no authority to stay this enhancement and defendant asserts that the trial court actually intended to impose the five year term, but simply misspoke in doing otherwise. Therefore, the trial court is directed to impose the five year term for this enhancement and to note that in the minutes of the sentencing hearing and the abstract of judgment. The minutes of the sentencing hearing shall also be amended to omit the reference to the sentencing court imposing a one year sentence for "prior #1." In fact, prior number one is the strike prior. Although prior number two is the prison prior, the sentencing court said nothing about it at sentencing. Section 667.5, subdivision (b) carries a one year term. In their supplemental brief, the People assert that the trial court had discretion to either impose or strike the term for this enhancement, citing *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1560, 1561, and we should remand the matter to allow the trial court to exercise its discretion in this regard. Defendant did not respond to this assertion in their reply to the People's contention, therefore, they appear to have conceded the point. The matter is remanded to allow the trial court to exercise its discretion in this regard and to reflect its decision in the minutes of the sentencing hearing and the abstract of judgment. If the sentencing court chooses to strike the term, it must state its reasons for doing so on the record. (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 531, 532.) We further direct the trial court to amend the abstract

15

to omit the references that a five year term was imposed for the section 667.5, subdivision (b) enhancement and a one year term for the section 667, subdivision (a)(1) enhancement.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.